## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| Reid Parr, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BitPay, *et al.*,<br><br>*Defendants*. | Case No. 4:25-cv-00850<br><br><br>**Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order & Order Authorizing Expedited Discovery** |

Plaintiffs Reid Parr, Bradley Long, Daniel Adams, Samuel Adams, and Dylan Bost (collectively, the "Plaintiffs") hereby request that the Court enter (i) a temporary restraining order freezing the Defendants' assets and (ii) an order authorizing Plaintiffs to engage in expedited discovery. In support, Plaintiffs respectfully show the Court as follows.

### I.    Preliminary Statement

Plaintiffs filed this action to recover assets lost to a cryptocurrency-related fraud and conversion scheme operated by a sophisticated criminal syndicate. The Defendants stole more than assets worth more than $490,527 from Plaintiffs—a devastating loss. As is typical in these cases, Plaintiffs do not know the Defendants' true identities or their precise whereabouts. But, with the assistance of a professional blockchain investigator, Plaintiffs traced

- 1 -

their stolen assets to accounts controlled by the Defendants at two cryptocurrency exchanges. This tracing is fundamental to the relief Plaintiffs seek in this Motion.

Plaintiffs' present aims are to preserve the status quo and serve the Defendants with process. Accordingly, Plaintiffs now seek (i) an *ex parte* temporary restraining order freezing the Defendants' assets and (ii) authorization to issue subpoenas to various third parties seeking information about the Defendants and their activities.

## II.     Supporting Materials

Plaintiffs submit the following materials in support of this Motion.

### A.     Cole Affidavit

Evan Cole is Plaintiffs' investigator in this case. Mr. Cole's affidavit proceeds in three parts, as follows.

*The Pig-Butchering "Scamdemic."* Mr. Cole's affidavit first provides background about the pig-butchering "scamdemic" to which Americans are losing billions each year. In doing so, he relies on his deep experience investigating pig-butchering cases and the FBI's most recent cybercrime report, which shows that more than forty thousand Americans reported losing more than *$5.8 billion* in losses to pig-butchering scams in 2024 alone.[1]

---

[1] Ex. 1, Affidavit of Evan Cole ("Cole Aff."), ¶¶ 3 – 5 (describing pig-butchering epidemic); Ex. 1-A, FEDERAL BUREAU OF INVESTIGATION INTERNET CRIME COMPLAINT CENTER, *2024 Internet Crime Report,* p. 36.

*The BitPay Scam*. Next, Mr. Cole's affidavit explains why there is no doubt that the Defendants are the perpetrators of a pig-butchering scam. It does so by comparing the facts in the Complaint with the scam "typology" set out in the most comprehensive academic study of pig-butchering scams to date, and against Mr. Cole's own review of the documentary evidence and experience investigating pig-butchering scams.

*Investigation*. Mr. Cole's affidavit next attests to the investigative findings that are fundamental to the relief that Plaintiffs seek here. It does so by first providing a plain-English description of the blockchain tracing Mr. Cole has performed, tracing the path of the assets the Defendants misappropriated from Plaintiffs and attesting to those assets' ultimate destinations at two of the world's largest cryptocurrency exchanges. Mr. Cole attaches blockchain tracing reports and visualizations documenting and illustrating these asset flows. Mr. Cole's affidavit then explains the acute risk of irreparable harm in cryptocurrency-related cases. Finally, it details the open-source intelligence investigation conducted to date and the third-party subpoena targets already identified.

### B.    Hoda Affidavit

Marshal Hoda is counsel to Plaintiffs in this matter. Mr. Hoda's affidavit attests to the reasons why the Court should not require notice before issuance of an *ex parte* temporary restraining order and verifies the allegations set out in Plaintiffs' Complaint by reference to his personal review of the pertinent evidentiary materials and professional experience as one of

the few attorneys nationwide with routine experience in representing pig-butchering scam victims.[2]

## III.    Factual Allegations

### A.    The Pig-Butchering "Scamdemic"

As detailed in Plaintiffs' Complaint,[3] the Defendants' scheme bears the unmistakable characteristics of a pig-butchering scam. In such scams, the perpetrators convince the victim to 'trade' or 'invest in' cryptocurrencies using a fake-but-realistic-looking online platform or application that the perpetrators control.[4] But no legitimate financial activity ever occurs.[5] The perpetrators simply steal the victim's money, then disappear into cyberspace.[6] The hallmarks of these scams are so consistent and distinctive that experienced investigators can positively identify a pig-butchering scam in a five-minute victim interview.

This is fraud on an industrialized scale. Last year, the FBI received 41,557 reports of cryptocurrency-related investment fraud.[7] These victims

---

[2] Ex. 2, Affidavit of Marshal Hoda ("Hoda Aff."), ¶¶ 1 – 6.

[3] Dkt. No. 1 ("Complaint"), ¶¶ 16 – 20.

[4] Cole Aff., ¶¶ 3 – 7 (describing pig-butchering scams and providing academic literature and FBI data for comparison).

[5] *Id.*

[6] *Id.*

[7] *Id.* at ¶¶ 5 – 7 (describing scope and scale of pig-butchering scamdemic and attaching FBI cybercrime report); Ex. 1-A, FEDERAL BUREAU OF INVESTIGATION INTERNET CRIME COMPLAINT CENTER, *2024 Internet Crime Report*, p. 36.

collectively reported *$5.8 billion* in losses in 2024 alone.[8] The FBI has reported a 29% increase in pig-butchering victim complaints and a 47% increase in losses from 2023 to 2024.[9] Law-enforcement resources have been overwhelmed by the scale of this epidemic, such that most victims receive no response to their law-enforcement reports.[10]

Pig-butchering syndicates' mechanics are well known. They are managed at the highest level by professional criminals, who use forced labor to fill their operations' rank-and-file.[11] These 'agents' are trained in social-engineering and psychological-manipulation techniques, which they use to deceive and steal from the syndicates' victims.[12]

The ultimate beneficiaries are foreign cybercriminals, who have become fantastically rich at the expense of the American middle class.[13] The transfer of wealth and resulting devastation are so great that the scam bosses themselves describe the pig-butchering epidemic as "World War III."[14]

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] THE ECONOMIST, *Opportunity of a Lifetime*, Scam Inc. (podcast), Season 1, Episode 2, available at: https://podcasts.apple.com/lt/podcast/2-opportunity-of-a-lifetime/id1785226676?i=1000689590456 (published February 6, 2025), at timestamp 17:30.

### B.    The BitPay Scam

As detailed in Plaintiffs' Complaint,[15] the Defendants' scheme bears the unmistakable characteristics of one of the pig-butchering scam "typologies" described in detail in Mr. Cole's affidavit.[16] The Defendants initiated contact with Plaintiffs at various times between May 2025 and June 2025 using WhatsApp and word-of-mouth from other investors to entice them to invest in the BitPay cryptocurrency staking platform.[17] BitPay purported to be an automated service whereby investors could link their TrustWallet cryptocurrency wallets to BitPay, using the funds in the wallets as "stakes" in various new cryptocurrencies.[18] The "mining rewards" from staking would then be returned to investors as profits deposited directly into their TrustWallet crypto wallets.[19]

After patiently gaining access to Plaintiffs' and other victims' wallets and making small periodic transfers into those wallets, giving the illusion of profitability, Defendants then began emptying Plaintiffs' wallets programmatically. In less than an hour on June 9, 2025, Defendants transferred the entirety of Plaintiffs' funds from their wallets to a pooling

---

[15] Complaint, ¶¶ 1 − 4, 16 − 20.

[16] Cole Aff., ¶¶ 6 − 13.

[17] Complaint, ¶ 16.

[18] *Id.*

[19] *Id.*

address, before transferring the stolen funds further through the blockchain in a pattern typical of pig-butchering criminals.[20]

The BitPay platform was never an investment or staking platform of any sort. The Defendants transferred illusory profits into Plaintiffs' wallets to gain their trust and induce them to continue contributing funds to their compromised wallets. The amount of funds transferred to Plaintiffs in this way was dwarfed by the amount ultimately stolen from them.[21]

### C.    Blockchain Tracing Results

Plaintiffs' investigator has traced the assets stolen from Plaintiffs through the blockchain. As detailed in the Cole affidavit, the assets the Defendants stole from Plaintiffs can be traced to accounts they control at the Binance and OKX cryptocurrency exchanges (the "Destination Exchanges"). The tracing methodology is set forth more fully in the Cole affidavit and the attachments thereto.

### IV.    Relief Sought

Plaintiffs seek (i) a temporary restraining order freezing the Defendants' accounts at the Destination Exchanges and the assets within them and (ii) an order authorizing expedited discovery. The balance of this Motion will articulate the standards applicable to these requests and explain why Plaintiffs have satisfied them.

---

[20] *Id.*, ¶ 18; Cole Aff., ¶¶ 11 – 12.

[21] Complaint, ¶ 19.

### A.    The Court should issue an *ex parte* Temporary Restraining Order freezing the Defendants' accounts at the Destination Exchanges.

Plaintiffs request that the Court issue an *ex parte* temporary restraining order freezing the Defendants' accounts at the Destination Exchanges. The standard for issuance of such an order has both procedural and substantive aspects. This section will first explain why Plaintiffs have satisfied these requirements. It will then detail the Court's authority to issue an asset-freezing order in this case, and why it should indeed do so.

#### 1.    Plaintiffs have met the procedural requirements for issuance of an ex parte restraining order.

The Court has the authority to issue an *ex parte* temporary restraining order without notice or a hearing if (i) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (ii) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."[22] Each of these requirements is met here.

*Element 1: Immediate & Irreparable Injury*. The Complaint, the Cole Affidavit, and the Hoda Affidavit show the likelihood of immediate and irreparable injury or loss. These materials first establish that Plaintiffs were victimized by Defendants in a pig-butchering scam.[23] The tactics on display

---

[22] FED. R. CIV. P. 65(b)(1)(A)-(B).

[23] Complaint, *generally*.

here are a precise match for those that have been described in news reports, law-enforcement bulletins, and reported cases.[24] Any law-enforcement agent or investigator familiar with this area would conclude that Plaintiffs were the victims of a pig-butchering scam immediately upon reviewing the evidence, just as Plaintiffs' investigator has here.[25]

The risk of immediate and irreparable injury is posed by the fact that cybercriminals like the Defendants can and do move crypto assets from address to address in mere seconds, with the click of a button.[26] And while crypto assets held at exchange-based addresses can be frozen and involuntarily disgorged, most assets held in "self-custody" or at non-compliant exchanges cannot.[27] Thus, the tracing of Plaintiffs' assets to the Destination Exchanges provides a unique and fleeting opportunity to restrain further movement of those assets while Plaintiffs identify and serve the Defendants. Courts have repeatedly recognized that these features of blockchain technology justify the issuance of *ex parte* freezing orders in crypto-fraud cases.[28]

---

[24] Cole Aff., ¶¶ 6 – 7, 13.

[25] *Id.*, ¶ 13.

[26] *Id.*, ¶ 22.

[27] *Id.*, ¶ 23.

[28] *See, e.g.*, *Harris v. Upwintrade*, 1:24-cv-00313-MJT, Dkt. 7 (E.D. Tex.) (Truncale, J.) (Aug. 8, 2024), at p. 9 (granting TRO in functionally identical pig-butchering case and noting "[i]n light of the speed with which cryptocurrency transactions are made, as well as the potential that the Defendants may further move the assets they are alleged to have stolen, the Court finds that the [Plaintiffs'] request to freeze the exchange accounts to

*Element 2: Notice.* The Hoda Affidavit certifies in writing the efforts made to give notice and the reasons why it should not be required.[29] That affidavit proceeds from the well-established rule that the Court has the authority to enter an *ex parte* order not only where notice to the adverse party is impracticable, but where "notice to the defendant would render fruitless [the] prosecution of the action."[30] Under this logic, courts have found that notice of an asset-freeze motion is not required if the parties to be enjoined "are likely to dissipate assets and destroy business documents," such that the

---

which those assets were transferred is justified, as have other courts considering similar circumstances"); *Cohn v. Popescu*, 1:24-cv-00337-MJT, Dkt. 8 (E.D. Tex.) (Truncale, J.) (Aug. 30, 2024) (same); *Ohlin v. Defendant 1*, No. 3:23-cv-8856-TKW-HTC, 2023 WL 3676797, at *3 (N.D. Fla. May 26, 2023) ("Considering the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions, it is imperative to freeze the Destination Addresses to maintain the status quo to avoid dissipation of the money illegally taken from Plaintiffs."); *Jacobo v. Doe*, No. 1:22-CV-00672DADBAKBAM, 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022) ("Because it would be a simple matter for [defendant] to transfer [the] cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive relief.") (cleaned up); *Astrove v. Doe,* No. 1:22-CV-80614-RAR, 2022 WL 2805315, at *3 (S.D. Fla. Apr. 22, 2022) (same).

[29] Hoda Aff., ¶¶ 1 – 6.

[30] *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979); *see also, e.g.*, *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (noting that *ex parte* order is justified under this logic if applicant shows that "the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history").

very act of providing notice would "cause immediate and irreparable, injury, or damages to [the] Court's ability to award effective final relief."[31]

Mr. Hoda's affidavit avers that pig-butchering scammers like the defendants routinely destroy evidence, dissipate assets, and violate court orders.[32] These observations flow from counsel's deep experience in this area. Counsel has personally interviewed approximately 300 victims of pig-butchering scams, and The Hoda Law Firm counts more than 70 of those victims as clients. Counsel has secured numerous freezing orders and orders granting expedited discovery in these cases, from courts around the country, and has personally supervised the implementation of those freezing orders and the discovery process. All of this experience has shown, time and again, that pig-butchering scammers like the Defendants will take *any available opportunity* to destroy evidence, dissipate assets, and violate court orders.

If the Defendants were provided notice of this Motion, it would be "a simple matter" for them to "transfer [the stolen cryptocurrency] to unidentified recipients outside the traditional banking system, including contacts in foreign countries, and effectively put it beyond the reach of this

---

[31] *Fed. Trade Comm'n v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800, at *2 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, No. 0:18-CV-60379-KMM, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018).

[32] Hoda Aff., ¶¶ 1 – 6.

court."[33] Numerous courts, including this Court, have applied just this logic in granting *ex parte* asset-freezing orders in crypto-fraud cases like this one.[34]

2. *Plaintiffs have met the substantive requirements for issuance of a temporary restraining order.*

To obtain a temporary restraining order, the movant must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction is in the public interest.[35] Plaintiffs have met each of these requisites for the reasons set out below.

---

[33] *Jacobo*, 2022 WL 2052637, at *3 (quoting *Dluca*, 2018 WL 1830800, at *2).

[34] *See, e.g.*, *Harris*, Case No. 1:24-cv-00313-MJT, Dkt. 7, at p. 7 (issuing TRO without notice in pig-butchering case where "the thrust of the [Plaintiffs'] allegations is that the Defendants are professional cybercriminals who have every motivation to place their ill-gotten gains beyond the reach of this Court or any other authority … [and they] have provided sufficient evidence to suggest that the Defendants will in fact further dissipate assets if they were given notice of this motion"); *Gaponyuk v. Alferov*, No. 2:23-cv-01317, 2023 WL 4670043, at *2 (E.D. Cal. July 20, 2023) (issuing *ex parte* asset-freeze TRO in similar crypto-fraud case, and writing that "federal district courts have granted *ex parte* relief in situations like this one, noting the risks that cryptocurrencies may rapidly become lost and untraceable"); *Ohlin*, 2023 WL 3676797, at *2 (notice not required where plaintiff offered declarations showing that the defendants were crypto-criminals, which gave the court "every reason to believe the Defendants would further hide those [stolen] assets if they were given notice"); *Jacobo*, 2022 WL 2052637, at *3 (notice not required because plaintiff made credible allegations that defendants were crypto-criminals, which "pose[d] a heightened risk of asset dissipation").

[35] *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017).

- 12 -

*Element 1: The Merits.* Plaintiffs allege that the Defendants are liable for (1) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), (2) conversion, and (3) fraud. Plaintiffs are likely to succeed on the merits of each of these claims.

*RICO Claim.* To recover on a civil RICO claim, a plaintiff must show (1) a violation of 18 U.S.C. § 1962 (a "RICO violation"), (2) an injury to his business or property, and (3) that such injury was caused by the RICO violation.[36] To prove a RICO violation, a plaintiff must show that the defendant is (1) a person[37] who engaged in (2) a pattern[38] of racketeering activity,[39] (3) connected to the acquisition, establishment, conduct or control of an enterprise.[40]

Plaintiffs' RICO claim is likely to succeed. The Complaint makes non-conclusory allegations sufficient to establish each element, including by (1)

---

[36] *Lewis v. Danos*, 83 F.4th 948, 956 (5th Cir. 2023).

[37] A RICO "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961.

[38] A "pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

[39] "Racketeering activity" includes acts indictable under 18 U.S.C. § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud). 18 U.S.C. § 1961(1)(B).

[40] An enterprise is "a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (defining enterprise and recounting elements).

identifying and defining the Defendants' enterprise,[41] (2) explaining their pattern of wire fraud,[42] and (3) recounting the injuries suffered as a direct result of the Defendants' racketeering scheme.[43] The Complaint shows that the Defendants' scheme was the very definition of an enterprise created solely to perpetrate a pattern of wire fraud, and on a global scale.[44] At least one court has issued a default judgment approving a civil RICO claim in a crypto-fraud case functionally identical to this one.[45]

*Conversion Claim.* To prevail on a conversion claim, a plaintiff must show "(1) she has a right to the property at issue; (2) she has an absolute and unconditional right to the immediate possession of that property; (3) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property; and (4) she made a demand for the return of the property."[46]

---

[41] Complaint, ¶¶ 16 – 20.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Order on Motion for Final Default Judgment, *Sun v. Defendant 1*, No. 1:23-cv-21855 (S.D. Fla. Dec. 8, 2023), pp. 3-4 ("The allegations in Plaintiff's Amended Complaint, admitted by default, establish each element of a RICO § 1962(c) violation. Specifically, Plaintiff alleges that Defendant and her co-conspirators operate a sophisticated global internet cryptocurrency fraud and conversion scheme …").

[46] *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at *11 (Tex. App.—Dallas Aug. 28, 2017, pet. denied).

Plaintiffs' conversion claim is likely to succeed. The Complaint and the Cole Affidavit show that the Defendants acted intentionally, that their scheme was wrongful, and that they took control of Plaintiffs' assets and have not returned them.[47] Numerous courts have found that plaintiffs were likely to succeed on conversion claims in in crypto-fraud cases.[48]

*Fraud Claim*. To prevail on a fraud claim, a claimant must prove: (1) the defendant misrepresented a material fact; (2) the defendant knew the representation was false; (3) the claimant did not know the representation was false; (4) the defendant made the misrepresentation intending that the claimant act on it; and (5) damages resulted from the claimant's reliance.[49]

Plaintiffs' fraud claim is likely to succeed. The Complaint shows that that the Defendants intentionally and falsely represented that Plaintiffs were investing in cryptocurrency through a legitimate platform with the intention of causing Plaintiffs to transfer their assets to the Defendants' control, that

---

[47] Complaint, ¶¶ 16 – 20.

[48] *See, e.g.*, *Bullock v. Doe*, No. 23-CV-3041 CJW-KEM, 2023 WL 9503380, at *5 (N.D. Iowa Nov. 3, 2023) ("Because the claim underlying this request [for an asset-freeze TRO] is mainly conversion—i.e., defendants have plaintiff's property wrongfully—plaintiff's likelihood of success on the merits of this claim suffice for this factor to weigh in favor of plaintiff and the Court need not discuss the further causes of action."); *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *4 (E.D. La. Feb. 23, 2024) ("It appears from the record that Defendants have no right to claim either possession or ownership of the stolen assets, and Defendants' taking of the funds is clearly inconsistent with Plaintiff's rights of ownership.").

[49] *Las Palmas Med. Ctr. v. Moore*, 349 S.W.3d 57, 67 (Tex. App.—El Paso 2010, pet. denied).

these statements were material to Plaintiffs, and that Plaintiffs acted on the Defendants' misrepresentations to their detriment.[50]

*Element 2: Irreparable Harm.* This irreparable-harm requirement is satisfied for the same reasons explained in Section IV(A)(1), above. As noted there, courts have repeatedly found a risk of irreparable harm in crypto-scam cases like this one.[51]

*Element 3: Balancing.* The threatened injury to Plaintiffs outweighs any damage a freezing order might cause to the Defendants. Plaintiffs have lost a life-changing sum, and the order they seek is the only hope of preserving some assets for recovery. And while an asset freeze might cause temporary inconvenience to the Defendants, any restraint implemented can be undone should future developments require.[52]

*Element 4: Public Interest.* A freezing order will serve the public interest because it will "dissuade would-be fraudsters from stealing, laundering illegal proceeds, and preying on Americans" like Plaintiffs.[53] It

---

[50] Complaint, ¶¶ 32-33.

[51] *See* n.17, *supra* (collecting cases).

[52] *See, e.g., Licht*, 2023 WL 4504585, *3 (balancing factor weighed in plaintiff's favor because alleged crypto-thieves faced only "inconvenience" of asset-freeze, which could be undone); *Gaponyuk*, 2023 WL 4670043, at *3 (same, finding "a short-term freeze is unlikely to present any great harms"); *Jacobo*, 2022 WL 2052637, at *6 (same, finding "[a] delay in defendant's ability to transfer the [allegedly stolen] assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court").

[53] *Licht*, 2023 WL 4504584, at *3.

will also "prevent the Defendants from profiting from their scheme, ensuring they lack resources and incentives to perpetrate similar schemes in the future,"[54] and "provide[] assurance to the public that courts will take action to promote … recovery of stolen assets when they can be readily located and traced to specific locations."[55]

### 3. The Court has the authority to issue the asset-freezing injunction Plaintiffs seek.

Typically, a court may issue an order freezing a defendant's assets only after a plaintiff's claims have been brought to judgment.[56] This rule does not apply, however, where the plaintiff seeks equitable relief and a constructive trust over traceable stolen assets.[57] Plaintiffs seek just such relief here.[58] For that reason, the Court has the authority to issue the requested asset-freezing injunction.

---

[54] *Id.*

[55] *Jacobo*, 2022 WL 2052637, at *6 (quoting *Heissenberg*, 2021 WL 8154531, at *2); *see also, e.g.*, *Gaponyuk*, 2023 WL 4670043, at *3 (finding that asset freeze would "serve the public's interest in stopping, investigating, and remedying frauds").

[56] *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999).

[57] *See, e.g.*, *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *3 (E.D. La. Feb. 23, 2024) (issuing asset-freeze TRO in crypto-fraud case, noting that "numerous district courts … have issued a TRO in this exact circumstance to freeze a cryptocurrency asset," and collecting cases); *Jacobo*, 2022 WL 2052637, at *3 (issuing asset-freezing TRO where plaintiff sought constructive trust over allegedly stolen assets); *Gaponyuk*, 2023 WL 4670043, at *2 (same).

[58] Complaint, ¶ 35.

4.    *The Court should not require a bond.*

Rule 65(c) provides that a court issuing a preliminary injunction or TRO should do so "only if the movant give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[59] Yet, "[c]ourts retain extensive discretion to set the amount of a bond required as a condition for issuing a preliminary injunction and may, in fact, elect to require no bond at all."[60] The Defendants will not suffer any damages as a result of the requested asset freeze, which—as explained above—can be undone at any time if the Defendants choose to appear and challenge the injunction. Plaintiffs thus request that the Court decline to impose a bond.

**B.    The Court should authorize Plaintiffs to issue subpoenas seeking information about information about the Defendants and their activities.**

Typically, parties may not seek "discovery from any source before the conference required by Rule 26(f)."[61] But expedited discovery before a Rule 26(f) conference is permitted where "authorized … by court order."[62] Courts in this circuit apply a "good cause" standard to determine whether such an

---

[59] Fed. R. Civ. P. 65(c).

[60] *Astrove*, 2022 WL 2805345, at *5 (declining to require bond in crypto-theft case); *Jacobo*, 2022 WL 2052637, at *6 (same).

[61] Fed. R. Civ. P. 26(d)(1).

[62] *Id.*

order should issue.[63] Good cause may be found where "the need for expedited discovery in consideration of the administration of justice, outweighs the prejudice to the responding party."[64]

Many courts have authorized expedited discovery from cryptocurrency exchanges in cryptocurrency-related fraud cases like this one.[65] Indeed, courts have affirmatively held that any privacy interests that alleged cybercriminals have concerning the discovery of information about their identities and activities is outweighed by the need to adjudicate victims' claims against them.[66]

> 1.    *Proposed Discovery*

Plaintiffs' proposed discovery arises from the pre-suit investigation performed by their investigator. This investigation revealed that Plaintiffs' funds were transferred to two cryptocurrency exchanges: Binance and OKX

---

[63] *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011) (applying good cause standard).

[64] *Id.* at 239.

[65] *See, e.g., Strivelli v. Doe*, No. 22-cv-22060 2022 WL 1082638, at *2 (D.N.J. Apr. 11, 2022) (authorizing expedited discovery from cryptocurrency exchanges in crypto case and noting "the Court's review of cryptocurrency theft cases reveals that courts often grant motions for expedited discovery to ascertain the identity of John Doe defendants"); *Licht*, 2023 WL 4504585, at *4 (issuing broad authorization for expedited discovery in functionally identical crypto-fraud case and requiring that "any party served with a request for production shall produce all requested items within 72 hours of the request").

[66] *Gaponyuk*, 2023 WL 4670043, at *4 (finding alleged cybercriminals' privacy interests were "outweighed by the need to adjudicate the [victim's] claims," and holding that "privacy concerns shall not be a just cause for [a] subpoenaed non-party to withhold [] requested documents and information").

(the "Destination Exchanges"). Both exchanges have the ability to freeze the accounts which received Plaintiffs' assets and are likely to possess identifying information about the owners of those accounts.

### 2.    Information Sought

Plaintiffs seek the Court's authorization to issue subpoenas to the Destination Exchanges seeking the following information. For both targets, Plaintiffs seek to discover all biographical and contact information associated with the Defendants' accounts and addresses. Plaintiffs also seek to discover IP address and location logs showing the devices and locations from which the Defendants accessed these accounts.

Plaintiffs also seek to discover any payments information in the Destination Exchanges' possession, including the Defendants' transaction histories and information about the credit or debit cards the Defendants used to pay for the subpoena targets' services. As to the Defendants' payment methods, Plaintiffs seek only information sufficient to identify the Defendants' payments provider and the Defendants' account with that provider.

Finally, for both Destination Exchanges, Plaintiffs seek to discover the current account balances associated with the Defendants' accounts, their transaction histories, and identification of any other accounts on the respective platforms associated with the accountholders by re-use of biographical or contact information.

Courts have authorized similar discovery where the plaintiff adduced evidence that the persons about whom the information was sought were cybercriminals and the plaintiff also sought a temporary restraining order freezing the assets held in those accounts.[67] Plaintiffs would emphasize the importance of the account-balance and transaction-history information sought to the ability to effectively pursue this case. As set out above, cryptocurrency exchanges are an informational "black hole" for blockchain investigators.[68] Thus, although Plaintiffs' investigator has traced the stolen assets to the Destination Exchanges, Plaintiffs cannot determine the Defendants' current account balances or trace their stolen assets past these exchanges unless they are authorized to discover this information from the exchanges themselves.

Finally, Plaintiffs urge the Court to consider the effect of its ruling on the scope of expedited discovery on victims of pig-butchering scams more broadly. As a matter of national policy, these victims need the ability to move decisively against the scammers who victimized them within the confines of the Federal Rules. Plaintiffs hope that the Court's decision will move the law in that direction.

---

[67] *Strivelli*, 2022 WL 1082638, at *2 (granting broad expedited discovery in functionally identical crypto-fraud case); see also Licht, 2023 WL 4504585, at *4 (same).

[68] Cole Aff., ¶ 14.

## V.    Conclusion

For the reasons set out above, Plaintiffs have met the standards for issuance of a temporary restraining order and an order authorizing expedited discovery in this matter. Plaintiffs request that the Court issue this relief in the form of the proposed order submitted with this Motion.

Dated:  August 22, 2025

Respectfully submitted,

THE HODA LAW FIRM, PLLC

_____

Marshal J. Hoda, Esq.
Tx. Bar No. 2411009
3120 Southwest Fwy
Ste 101 PMB 51811
Houston, TX 77098
o. (832) 848-0036
marshal@thehodalawfirm.com

*Attorney for Plaintiffs*